UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
STUART JACKSON,                                              :
:
                      Plaintiff,       :
:           11-CV-5826 (VSB)
           - against -                            :
:           **MEMORANDUM & ORDER**
NEW YORK COUNTY ASSISTANT                                    :
DISTRICT ATTORNEY SEEWALD, et al.,                           :
:
                      Defendants.      :
:
------------------------------------------------------------X

Appearances:

Amy B. Marion
Alexander R. Klein
Barket Marion Epstein & Kearon, LLP
Garden City, New York
*Counsel for Plaintiff*

Cynthia Sittnick
Assistant District Attorney
District Attorney's Office, New York County
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

       Before me is the Motion for Summary Judgment of New York County Assistant District

Attorney Andrew Seewald and Senior Investigator Michael Wigdor (collectively, "Defendants").

(Doc. 69.)  Defendants are entitled to qualified immunity because it was objectively reasonable

for them to conclude that probable cause existed to believe that Plaintiff Stuart Jackson

("Plaintiff") had committed a crime. Accordingly, for the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED.

## I. Factual Background

The following facts are undisputed unless otherwise noted.

Plaintiff is an attorney who at various times represented Stuart Ross ("Ross"). (P's 56.1 Resp. ¶ 1.)[1] Ross is estranged from his daughter, Allison Blitzer, who is married to David Blitzer ("Blitzer"). (*Id.* ¶ 2.) Despite this estrangement, David Blitzer gave Ross money over the years to support Ross's business ventures and for other purposes. (*Id.* ¶ 4; Compl. ¶¶ 24-26.)[2] For example, Blitzer gave Ross $15,000 in January 2008 and an additional $50,000 in May 2008. (P's 56.1 Resp. ¶ 5.) Blitzer was an employee of the Blackstone Group. (*Id.* ¶ 3.)

In June 2008, Plaintiff traveled to London on independent business. (*Id.* ¶ 6.) While in London, Plaintiff met with David Blitzer on Ross's behalf. (*Id.*) Plaintiff informed Blitzer that Ross would be willing to enter into a consent decree in which Ross would relinquish his rights to see his grandchildren.[3] (*Id.*) On June 28, 2008, David Blitzer called Ross and told Ross that he would not be giving Ross any more money. (*Id.* ¶ 7.) Thereafter, Ross sent "a barrage of threatening phone messages and e-mails" to David Blitzer. (*Id.* ¶ 8.) Blitzer and Plaintiff then had a telephone conversation, in which Blitzer at least attempted to play for Plaintiff a recording of some of Ross's unwanted communications.[4] (*Id.* ¶ 9.)

In July 2008, Blitzer retained attorney Roger Stavis. (*Id.* ¶ 10.) On July 30, 2008, Stavis

---

[1] "P's 56.1 Resp." refers to Plaintiff's Statement Controverting Defendants' Rule 56.1 Statement. (Doc. 73.)

[2] "Compl." refers to the Complaint. (Doc. 1.)

[3] Ross's grandchildren are Allison and David Blitzer's children.

[4] It is disputed whether Blitzer succeeded in playing the recording. According to Plaintiff, the playback equipment was not working, and Plaintiff could "only hear some mumbled words which sounded like Stuart Ross who was very drunk." (P's 56.1 Resp. ¶ 9.)

2

called Plaintiff; the precise content of this conversation is disputed. (*Id.* ¶ 11.) On August 5, 2008, Plaintiff called Stavis and told Stavis that, in exchange for a $5.5 million payment from Blitzer, Ross would enter into a consent decree forgoing his rights to visit his grandchildren. (*Id.* ¶ 14.) Furthermore, as a "bonus," Ross would cease making phone calls to the Blitzers and to persons associated with the Blackstone Group, Blitzer's employer. (*Id.*) Later that day, Stavis sent Plaintiff a letter memorializing the terms of this offer. (Sittnick Decl. Ex. E.)[5] The following day, Plaintiff responded with a letter, stating in part: ". . . Mr. Ross granted David Blitzer an option for the benefit of The Blackstone Group, its officers, directors, employees, subsidiaries, and affiliates . . . . The exercise price for said option is the same as that offered by Mr. Ross to Mr. Blitzer concerning Mr. Ross's daughter and grandchildren, i.e., $5.5 million. If the offer to Mr. Blitzer and [this] option . . . are both accepted, the total amount due is $11 million." (*Id.* Ex. F.) Plaintiff's letter stated that the deadline for Blitzer's acceptance of either offer was August 15, 2008. (*Id.*)

Upon receiving Plaintiff's letter, Stavis contacted the New York County District Attorney's Office. (P's 56.1 Resp. ¶ 17.) On August 12, 2008, Stavis and the Blitzers met with Defendants Seewald and Wigdor, along with other staff of the District Attorney's Office. (*Id.* ¶ 18.) Stavis and David Blitzer provided Defendants with audiotapes of messages left by Stuart Ross on Blitzer's office voicemail, and a copy of Stavis's confirmatory letter of August 5 and Plaintiff's letter of August 6. (*Id.*; Sittnick Decl. Ex. G.)[6] On August 13, Plaintiff wrote to Stavis to propose a meeting but requiring as a precondition of such a meeting a letter from Stavis

---

[5] "Sittnick Decl." refers to the Declaration of Cynthia M. Sittnick in Support of Plaintiff's Motion for Summary Judgment. (Doc. 65.)

[6] The Sittnick Declaration mistakenly lists Stavis's letter as being dated May 5, 2008 and Plaintiff's responsive letter as being dated May 6, 2008.

3

to Plaintiff "confirming . . . that Mr. Blitzer commits to paying Mr. Ross $5.5 million." (Marion Affirmation Ex. D.)[7] That same day, Stavis had a telephone conversation with Plaintiff that was tape-recorded by the District Attorney's Office, (P's 56.1 Resp. ¶ 20), and after that call Stavis responded with a letter indicating that his client would not "agree in advance to pay $5.5 million for [Ross] to stop harassing him, his family and The Blackstone Group," agreeing to meet, and expressing openness to a reasonable settlement, (Marion Affirmation Ex. E). After further communication, (P's 56.1 Resp. ¶¶ 22-23), Stavis informed Plaintiff in another recorded telephone call that David Blitzer agreed to meet with Ross, with their attorneys present, to discuss an agreement pursuant to which Ross would refrain from seeking visitation with his grandchildren and from contacting anyone at Blackstone, (*id.* ¶ 24.)

The meeting took place on August 21, 2008, at the Union League Club in Manhattan, and it was audio recorded by the District Attorney's Office. (*Id.* ¶ 25.) After some discussion about the available recourse for Blitzer if Ross violated the agreement, (*id.* ¶ 32), Ross asked Blitzer to specify the maximum sum of payment he was willing to consider, (*id.* ¶ 33). After leaving the room to consult with Stavis, Blitzer offered $250,000. (*Id.* ¶ 34.) After leaving the room with Plaintiff, Ross returned with a counteroffer of $400,000, (*id.* ¶ 37), which was rejected, (*id.* ¶ 38). Plaintiff then asked whether the offer of $250,000 was still on the table, (*id.* ¶ 39); Blitzer agreed to a $250,000 payment, provided that Stavis and Plaintiff could draft mutually agreeable language, (*id.* ¶ 40). At various points during the conversation, Blitzer and Stavis both expressed their doubts as to whether any such agreement would be legal or enforceable in court. (*See id.* ¶¶ 35, 40, 41.) At the end of the meeting, Blitzer made a $50,000 check out to Plaintiff "(as

---

[7] "Marion Affirmation" refers to the Affirmation of Amy B. Marion in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Statement Controverting Defendants' Rule 56.1 Statement. (Doc. 72.)

attorney),'' and wrote in the memo line "for Stuart Ross."  (*Id.* ¶ 42.)

After the meeting, Defendant Wigdor gave the tape of the meeting to Defendant Seewald for Seewald's review.  (*Id.* ¶ 43.)  The following morning, Wigdor arrested Ross at a hotel in Manhattan.  (Sittnick Decl. Ex. T.)  The next day, Wigdor arrested Plaintiff at the District Attorney's Office.  (*See* P's 56.1 Resp. ¶ 45.)  After the arrests, Seewald drafted a criminal complaint for Wigdor's signature.  (P's 56.1 Resp. ¶ 47.)  A New York County grand jury indicted both Ross and Plaintiff for attempted grand larceny in the second degree and attempted grand larceny in the third degree.  (*Id.* ¶ 48.)  Ross pleaded guilty to attempted grand larceny in the second degree.  (*Id.* ¶ 49)  Plaintiff proceeded to trial and was found not guilty of all charges. (*Id.* ¶ 50.)

## II.     Procedural History

Plaintiff initiated this action by filing his Complaint on August 19, 2011.  (Doc. 1.) Plaintiff asserted claims under 42 U.S.C. § 1983 for false arrest, withholding of exculpatory evidence, malicious prosecution, conspiracy, failure to intercede, and malicious abuse of process, as well as a state-law claim for malicious prosecution, against David Blitzer, Allison Blitzer, Roger Stavis, and numerous employees of the New York County District Attorney's Office involved in investigating and prosecuting Plaintiff.  (*Id.*)  The case was originally assigned to the Honorable Lewis A. Kaplan.  On November 3, 2011, Stavis moved to dismiss the Complaint. (Doc. 16.)  David and Allison Blitzer also moved to dismiss the Complaint on November 4, 2011.  (Doc. 20.)  On May 3, 2012, Judge Kaplan dismissed all of Plaintiff's claims against Stavis and the Blitzers.  (Doc. 32.)  The employees of the New York County District Attorney's Office moved to dismiss the Complaint on August 29, 2012.  (Doc. 42.)  On February 14, 2013, Judge Kaplan dismissed all of Plaintiff's claims against employees of the New York County

5

District Attorney's office, with the sole exception of Plaintiff's false arrest claims under 42 U.S.C. § 1983 against Defendants Seewald and Wigdor.  (Doc. 49.)

Defendants Seewald and Wigdor filed their answer on March 6, 2013.  (Doc. 50.)  The case was reassigned to me on February 3, 2014.  (Docket Entry of Feb. 3, 2014.)  Defendants Seewald and Wigdor filed the instant Motion for Summary Judgment and supporting evidence on April 28, 2014.  (Doc. 69.)  Plaintiff filed his opposition and supporting evidence on June 6, 2014.  (Doc. 71.)  Defendants filed their reply on July 2, 2014.  (Doc. 78.)

### III.  Legal Standard

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is

6

genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## IV.   Analysis

Defendants move for summary judgment on Plaintiff's claim for false arrest under 42 U.S.C. § 1983. "A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (internal quotation marks omitted) (alteration in original). To prevail on his claim for false arrest, Plaintiff must "show that (1) the defendant[s] intended to confine him, (2) [he] was conscious of the confinement, (3) [he] did not consent to the confinement, and (4) the

confinement was not otherwise privileged." *Id.* (internal quotation marks omitted). A person's confinement is privileged if there is probable cause to detain him. *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998). Probable cause is therefore a complete defense to a § 1983 false arrest claim. *Ackerson*, 702 F.3d at 19.

Here, it is undisputed that Defendants confined Plaintiff without his consent and that he was conscious of the confinement. (*See* Ds' Mem. 3.)[8] Defendants move for summary judgment on two grounds: (1) on the undisputed facts, Defendants had probable cause to arrest Plaintiff, (*see* Ds' Mem. 3-7); and (2) in the alternative, Defendants are entitled to qualified immunity because, on the basis of the undisputed facts, it was objectively reasonable for them to believe that there was probable cause to arrest Plaintiff, (*see* Ds' Mem. 7-10). Qualified immunity, like probable cause, is a "complete defense to false arrest claims." *Ackerson*, 702 F.3d at 21. I need not address these issues in any particular order.[9] *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 429 n.9 (2d Cir. 2009).

### A.   *Applicable law*

"Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been . . . committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). To assess whether probable cause existed, I must determine whether the facts known to arresting officers at the time of arrest "objectively provided probable cause to arrest." *Ackerson*, 702 F.3d at 19. It is irrelevant which

---

[8] "Ds' Mem." refers to Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment. (Doc. 64.)

[9] Relatively few cases provide guidance regarding the facts that are sufficient to give rise to probable cause to believe that a person has committed extortion. In this case, I therefore find it more prudent to begin by assessing whether Defendants are entitled to qualified immunity.

8

particular charges the arresting officer may have identified at the time of the arrest, as probable cause exists if there are sufficient facts to warrant the belief that the arrestee has committed any offense. *Id.* at 20. Probable cause is a "fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules"; the probable cause inquiry focuses on "probabilities" rather than "hard certainties" and takes account of "the factual and practical considerations of everyday life." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983)). Probable cause is evaluated under the totality of the circumstances. *Jenkins v. City of N.Y.*, 478 F.3d 76, 90 (2d Cir. 2007).

The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments" by immunizing them from suit for damages unless their conduct violated clearly established constitutional rights of which a reasonable person would have known. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (internal quotation marks omitted). It thus shields officers from liability unless they are "plainly incompetent" or "knowingly violate the law." *Id.* (internal quotation marks omitted). Therefore, even if there is no actual probable cause to arrest, arresting officers are entitled to qualified immunity if there was "arguable probable cause" to arrest, meaning that: (1) "it was objectively reasonable for the officer to believe probable cause existed"; or (2) "officers of reasonable competence could disagree" on whether there was probable cause. *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Qualified immunity protects the public official "not just from liability but also from suit[,] . . . sparing him the necessity of . . . undergoing a trial." *Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010) (internal quotation marks omitted).

Here, Defendants argue that they had probable cause to believe Plaintiff committed three distinct offenses at the time of his arrest: (1) attempted grand larceny in the second degree

9

pursuant to N.Y. Penal Law § 155.40, on the basis that Plaintiff and Ross attempted to extort property exceeding $50,000 from Blitzer; (2) grand larceny in the third degree, pursuant to N.Y. Penal Law § 155.35, on the basis that Plaintiff and Ross actually extorted property exceeding $3,000 from Blitzer; and (3) aggravated harassment in the second degree, pursuant to N.Y. Penal Law § 240.30, on the theory that Plaintiff aided and abetted Ross's harassment of Blitzer.[10]  (*See* Ds' Mem. 6-7.)

Extortion is defined under New York law, in pertinent part, as "compel[ing] or induc[ing] another person" to deliver property "by means of instilling in him a fear that, if the property is not so delivered, the actor or another will . . . [e]ngage in other conduct constituting a crime" or will "[p]erform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships."  N.Y. Penal Law § 155.05(2)(e)(iii), (ix).  New York courts have long held that an otherwise lawful action may become unlawfully extortionate when it is threatened for the purpose of extracting payment from another person rather than in pursuit of legitimate objectives.  *See, e.g.*, *People v. Dioguardi*, 168 N.E.2d 683, 690-91 (N.Y. 1960) (threat to refuse to remove picket line may be extortionate); *People v. Forde*, 552 N.Y.S.2d 113, 117 (App. Div. 1990) (threat to enforce provision of valid labor contract may be extortionate); *People v. Sheridan*, 174 N.Y.S. 327, 329 (App. Div. 1919) (threat to complain about defective elevator at place of business may be extortionate); *People v. Rackett*, 941 N.Y.S.2d 540, 2011 WL 6445226, at *5 (Nassau Cnty. Dist. Ct. Dec. 21, 2011) (information adequately alleged extortion by alleging that terminated employee delivered letter

---

[10] The aggravated harassment statute was subsequently held to be unconstitutionally vague and overbroad.  *See People v. Golb*, 15 N.E.3d 805 (N.Y. 2014).

10

to former supervisor threatening to expose improper business practices unless given a severance package); *see also Chevron v. Donziger*, 974 F. Supp. 2d 362, 582 (S.D.N.Y. 2014) (attorney's false representations to media to exert pressure on corporation to settle lawsuit were extortionate under the federal Hobbs Act).

Thus, Defendants had probable cause to arrest Plaintiff if the facts indisputably known to them at the time of the arrest warranted a reasonable belief that Plaintiff had attempted to deprive Blitzer of property by causing Blitzer to fear that, if he did not deliver the property, Ross would engage in conduct not materially beneficial to himself or Plaintiff and calculated to materially harm Blitzer's personal relationships or business. Defendants are entitled to qualified immunity if it was objectively reasonable for them to conclude, based upon what they undisputedly knew at the time of Plaintiff's arrest, that probable cause existed.

### B.  *Facts known to Defendants at the time of Plaintiff's arrest*

Defendants have established that, at the time of Plaintiff's arrest, they were undisputedly aware of the following information:

- In December 2007, Ross began repeatedly calling Blitzer at work to obtain money from him. (Sittnick Decl. Ex. G, at 2.)
- Blitzer gave Ross $15,000 in January 2008 and $50,000 in May 2008 to support Ross's business venture. (*Id.*)
- After Blitzer provided Ross with those funds to support his business venture, Ross demanded an additional $50,000. (*Id.*) When Blitzer refused to provide it, Ross explained in a series of emails and phone messages that he would contact Blitzer's colleagues at the Blackstone Group and tell them about Blitzer's purported offshore bank accounts and gambling activities. (*Id.*)

- In one message left on Blitzer's voicemail on June 23, 2008, Ross stated that he would "commit open warfare" against Blitzer if Blitzer did not send him money. (Sittnick Decl. Ex. V, at 1.) In another message the following day, Ross stated that, although he did not "want to continue to threaten" Blitzer, he would require payment of $50,000 or $100,000 to stop doing so. (*Id.*; *id.* Ex. Q.)

- In July 2008, Blitzer had a phone conversation with Plaintiff in which he played for Plaintiff an audio recording of at least one message which Ross had left on his voicemail and which Blitzer perceived as harassing.[11] (Marion Affirmation Ex. A, at 54:11-55:21; *see* Sittnick Decl. Ex. U, at 152:4-8 (establishing in unrebutted deposition testimony that Defendant Seewald was aware of Blitzer's communication to Plaintiff prior to Plaintiff's arrest).)

- Roger Stavis called Plaintiff and asked Plaintiff to tell Ross that he should stop harassing Blitzer and should not be compensated for doing so. (Sittnick Decl. Ex. A., at 82:17-83:13; *id.* Ex. C, at 379:19-381:10; *see id.* Ex. U, at 152:17-25 (establishing in unrebutted deposition testimony that Defendant Seewald was aware prior to Plaintiff's arrest that Stavis told Plaintiff that Ross was harassing Blitzer).)[12]

- On August 5, 2008, Stavis wrote to Plaintiff to confirm receipt of Plaintiff's verbal offer that Ross would "agree to cease his efforts to visit his grandchildren and daughter . . . and waive any rights to seek an order of the court compelling visitation"

---

[11] Plaintiff has established that it is disputed whether Blitzer actually succeeded in playing more than one recorded message during this conversation, due to technological difficulties with the recording. *See* Marion Affirmation Ex. A, at 91:19-93:17.

[12] Plaintiff has established that it is disputed whether Plaintiff ever used the word "harassment" himself or ever acknowledged that any harassment was taking place. (*See* Marion Affirmation Ex. J, at 546:15-547:11.) However, Plaintiff has not introduced any evidence to dispute that Stavis asked him to tell Ross that Ross should stop harassing Blitzer and should not be compensated for doing so, or to dispute that Defendants were aware of the substance of this conversation at the time of Plaintiff's arrest.

in exchange for $5.5 million, and that Ross would further agree as a "bonus" to cease contacting David Blitzer and other individuals at the Blackstone Group. (*Id.* Ex. E; *see id.* Ex. G, at 2 (establishing that Defendant Wigdor reviewed this letter).)

- On August 6, 2008, Plaintiff replied to Stavis, writing that: (1) the offer concerning Ross's waiver of his rights of communication and visitation with his daughter and grandchildren would need to be accepted by August 15, 2008, and that Ross "reserves the right to petition the appropriate court in Connecticut to protect his rights"; and (2) the "option for the benefit of The Blackstone Group, its officers, directors, employees, subsidiaries, and affiliates" was separate from the offer concerning Ross's daughter and grandchildren, would require an additional $5.5 million to accept, and would also need to be accepted by August 15, 2008. (*Id.* Ex. F.; *see id.* Ex. G., at 2 (establishing that Defendant Wigdor reviewed this letter).)[13]

- Through an exchange of phone calls and letters, Plaintiff and Stavis arranged a meeting at which Ross, Blitzer, Plaintiff, and Stavis would all be present. (*Id.* Exs. I, J, K, L, M; *see* Ex. U, at 152:10-14 (establishing in unrebutted deposition testimony that Defendant Seewald was aware of these communications prior to Plaintiff's arrest).)

- During the meeting, which Defendants audio recorded with Stavis and Blitzer's cooperation and consent, Ross said to Blitzer, "If there's a number, you're not going to go above the number, you want to give me the number, we're prepared to receive it." (*Id.* Ex. P, at 32:12-14.) Blitzer and Stavis left the room, (*id.* at 32:21), and, upon

---

[13] Although this letter is unsigned, it appears on Plaintiff's letterhead, and Plaintiff does not dispute the letter's authenticity or introduce any evidence that he did not write it.

13

their return, Blitzer stated, "I guess we would go no more than $250,000 for a global sum," (*id.* at 34:3). Stavis questioned whether any agreement would be enforceable. (*Id.* at 34:7-10.) After further back-and-forth, Ross and Plaintiff left the room. (*Id.* at 38:1.) Upon their return, Ross stated that he had "taken [Plaintiff's] counsel," (*id.* at 38:2-3), and proposed a counter-offer of $400,000 as a "reasonable number," (*id.* at 38:27-39:1). After Blitzer rejected the counter-offer of $400,000, (*id.* at 39:13, 39:26), Ross and Plaintiff inquired whether the offer of $250,000 still stood, (*id.* at 40:1, 40:13-16), and Blitzer said that it did, provided that Plaintiff and Stavis could draft mutually agreeable language, (*id.* at 40:17-22). Blitzer agreed to provide $50,000 immediately as a demonstration of good faith. (*Id.* at 45:3-17.) Blitzer asked, "Who wants the check?" and Plaintiff replied, "Stuart Jackson, as attorney." (*Id.* at 45:25-26.) Blitzer wrote a personal check for $50,000 to "Stuart Jackson (as attorney)" with "for Stuart Ross" in the memo line. (*Id.* Ex. R.)

## C. *Defendants are entitled to qualified immunity and to summary judgment.*

Defendants have established that there is no genuine dispute of material fact as to whether it was objectively reasonable to conclude, based upon the information undisputedly known to them at the time of Plaintiff's arrest, that there was probable cause to believe Plaintiff had engaged in criminal conduct.

Defendants surely had probable cause to believe that Ross was attempting to extort Blitzer. "[T]he crime of attempted larceny by extortion is complete upon the making of the extortionary threat coupled with the intent to commit larceny . . . ." *People v. Zaccaro*, 517 N.Y.S.2d 567, 568 (App. Div. 1987). Defendants knew that Ross had told Blitzer that he would engage in "open warfare" against Blitzer and would "continue to threaten" Blitzer unless Blitzer

14

paid him.  (Sittnick Decl. Ex. V, at 1.)  Defendants also knew that Ross had told Blitzer that he would contact Blitzer's colleagues at the Blackstone Group and tell them about Blitzer's purported offshore bank accounts and gambling activities.  (Sittnick Decl. Ex. G, at 2.)  There is no evidence that Defendants were aware of any legitimate reason Ross might have had for contacting Blitzer's colleagues at the Blackstone Group or for disclosing such purported information.  Defendants were also aware that Ross had requested $50,000 or $100,000 in a voicemail, (*id.* Ex. V., at 2), $5.5 million and $11 million in subsequent communications through Plaintiff, (*id.* Exs. E, F), and $400,000 at the meeting, (*id.* Ex. P, at 38).  It was therefore eminently reasonable for Defendants to conclude that:  (1) Ross threatened to take actions not materially beneficial to himself but calculated to materially harm Blitzer's business or personal relationships; and (2) Ross sought to compel Blitzer to pay him by instilling in Blitzer a fear that Ross would take these actions if Blitzer did not comply.  *See* N.Y. Penal Law § 155.05(2)(e)(ix).

      Defendants were at the very least objectively reasonable in concluding that there was probable cause to believe that Plaintiff had also attempted to extort Blitzer.  Defendants knew that Plaintiff initially presented Ross's forbearance from contacting employees of the Blackstone Group as a "bonus," but subsequently proposed that Blitzer pay an additional $5.5 million in exchange for Ross's forbearance.  (Sittnick Decl. Ex. F); *see Forde*, 552 N.Y.S.2d at 116 ("[T]he use of precise words are not necessary to convey a threat . . . , since innuendo or suggestion may be sufficient, if, based upon the circumstances and the relationship between the parties, the purport and natural effect of the innuendo or suggestion is found to convey a threat . . . .").  Defendants were also aware that Blitzer had raised the issue of Ross's harassment with Plaintiff, and that Stavis had told Plaintiff that Ross should stop harassing Blitzer and should not be compensated for doing so.  (Marion Affirmation Ex. A., at 54:11-55:21, 82:17-83:13.)

Defendants knew that Plaintiff and Ross maintained an attorney-client relationship, and Ross represented during the meeting at the Union League Club that he had followed Plaintiff's counsel concerning the amount of money he should demand. (*Id.* Ex. P, at 38:2-3.) In addition, $5.5 million was an unusually large sum for Ross to demand in exchange for declining to call his son-in-law's colleagues. (*See* Ds' Mem. 7.) Under the totality of these circumstances, it was objectively reasonable for Defendants to conclude that either: (a) Ross disclosed his actual motivations to Plaintiff; or (b) Plaintiff knew that Ross had no legitimate reason to contact employees of the Blackstone Group and was threatening to do so to cause Blitzer to fear the consequences of refusing to pay. Either way, it was objectively reasonable for Defendants to conclude that there was a fair probability that Plaintiff shared Ross's intent to obtain property from Blitzer by threats. Accordingly, Defendants had at least arguable probable cause to believe that Plaintiff committed attempted grand larceny in the second degree. *See* N.Y. Penal Law §§ 155.40, 155.05(2)(e)(ix).

Plaintiff identifies three factual disputes in opposing Defendants' motion, but I find none of these disputes to be material. First and most prominently, Plaintiff argues that there is a genuine factual dispute as to whether Plaintiff was actually aware of Ross's harassment of Blitzer. (*See* P's Mem. 12-13.)[14] Plaintiff testified that, when Stavis called to discuss Ross's harassing communications, Plaintiff was unaware of them, and when Plaintiff asked Ross, Ross denied having engaged in any such communications. (Marion Affirmation Ex. A, at 82:19-83:13.) As an initial matter, however, knowledge of Ross's harassment of Blitzer is not required for Plaintiff to have committed larceny or attempted larceny. Plaintiff need not have known of

---

[14] "P's Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. (Doc. 71.)

16

Ross's past harassment of Blitzer to have attempted to extort Blitzer by threatening that Ross would contact Blitzer's colleagues at the Blackstone Group in the future, in a manner calculated to materially harm Blitzer's business relationships while producing no material benefit to Ross. *See* N.Y. Penal Law § 155.05(2)(e)(ix).

To the extent Plaintiff's knowledge of Ross's prior harassment is relevant to the probable cause inquiry, the question is not whether Plaintiff was actually aware of it, but merely whether the facts known to Defendants supported the conclusion that it was fairly probable Plaintiff was aware of it. *See Escalera*, 361 F.3d at 745 ("The actual accuracy or veracity of this statement is irrelevant to a determination of whether [the officer] had arguable probable cause. Rather, the question is whether [the officer] could have reasonably relied on it."). Defendants had sufficient facts at their disposal to reasonably so conclude. For instance, Defendants were aware that Blitzer had played for Plaintiff at least one recorded message in which Ross engaged in behavior that Blitzer considered harassing. (Marion Affirmation Ex. A, at 54:11-55:21; *see* Sittnick Decl. Ex. B, at 152:4-8.) Defendants were also aware that Stavis had called Plaintiff to ask Plaintiff to instruct Ross to stop harassing Blitzer. (Sittnick Decl. Ex. A., at 82:17-83:13; *id.* Ex. C, at 379:19-381:10; *see id.* Ex. B, at 152:17-25.) Defendants had also reviewed the harassing messages themselves, some of which were left after Plaintiff had already begun negotiating with Blitzer on Ross's behalf. (*Id.* Ex. V, at 2.) And Defendants were aware that Blitzer discussed those messages during the meeting at the Union League Club. (*Id.* Ex. P, at 20.) That Plaintiff also included a self-serving denial of knowledge in a letter to Stavis, (*id.* Ex. L; *see* P's Mem. 12-13), would not make it unreasonable for Defendants to infer that Plaintiff had knowledge of the harassment. *See, e.g.*, *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998) ("A suspect's denial of his suspicious behavior is a factor the officer may consider in determining

whether probable cause exists, but it does not require the officer to forego arrest if the facts otherwise establish probable cause.").

Second, Plaintiff identifies a genuine factual dispute as to whether Plaintiff actually intended to obtain a portion of any payment that Blitzer made to Ross. (Ds' Mem. 11.) Defendant Wigdor testified before the grand jury that Plaintiff told him after being arrested that he expected to receive a cut of any payment to Ross. (Sittnick Decl. Ex. T, at 272:4-17). In a sworn declaration, Plaintiff denies that he made any such statement or had any such expectation and avers that he was compensated by Ross on an hourly basis. (*See* Marion Affirmation Ex. H). As a matter of law, however, Plaintiff need not have intended to keep any of the proceeds himself to have committed larceny or attempted larceny by extortion. "A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself *or to a third person*, he wrongfully takes, obtains or withholds such property from an owner thereof," including by extortion. N.Y. Penal Law § 155.05(1) (emphasis added). All that is required is that Plaintiff intended to deprive Blitzer of property or to appropriate Blitzer's property to Ross, not that Plaintiff intended to keep the property for himself.

Even if Plaintiff's intent to keep the property himself were an element of the offense, the factual dispute identified by Plaintiff would not be material to the probable cause analysis. Again, the relevant question is not whether Plaintiff actually intended to keep a portion of any payment made to Ross, but merely whether the facts undisputedly known to Defendants at the time of the arrest reasonably supported the conclusion that Plaintiff so intended. "An assessment of intent frequently depends upon circumstantial evidence," and "substantially less" evidence is needed to support an inference of culpable intent when making a probable cause determination than would be required at trial. *Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2d Cir. 2013).

Plaintiff's request that Blitzer issue the $50,000 check in his name tends to suggest that he intended to keep some of the proceeds. (Sittnick Decl. Ex. P, at 45:25-26.) So, too, does the fact that lawyers often work on a contingency fee basis, as Defendants surely would have known. It would also be reasonable for Defendants to assume that Plaintiff would not receive only hourly compensation if he actually succeeded in obtaining $11 million for his client. *See United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (requiring consideration of "the totality of the circumstances and common sense" in evaluating probable cause).

Third, Plaintiff identifies a factual dispute concerning the content of the discussion at Plaintiff's meeting with Blitzer in London. Defendant Seewald testified at his deposition that he thought Blitzer told him during their first conversation that, at the London meeting, Plaintiff "was kind of making a pitch for Blitzer to give money to Ross." (Marion Affirmation Ex. I, at 28:12-13.) In response, Plaintiff points to his own deposition testimony, in which he stated that the issue of money was never raised at the London meeting. (*Id.* Ex. A., at 29:3-13.) However, Plaintiff identifies no evidence to suggest that, at the time of Plaintiff's arrest, Defendants knew or should have known anything about the London meeting other than what Blitzer had told them. Plaintiff therefore fails to raise a dispute of fact material to the probable cause determination. *See Zellner*, 494 F.3d at 368. More important, even assuming that Defendants had known that money was not discussed at the London meeting, the remaining facts known to Defendants supported at least arguable probable cause for Plaintiff's arrest for the reasons explained above.

I need not decide whether probable cause actually existed to arrest Plaintiff because, at the very least, there is no genuine dispute of material fact as to whether it was objectively reasonable for Defendants to believe that probable cause existed. Defendants are therefore entitled to qualified immunity from suit for damages. *See Ackerson*, 702 F.3d at 21.

## V. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc. 69), and close the case.

SO ORDERED.

Dated: March 9, 2015
      New York, New York

*Vernon Broderick*
Vernon S. Broderick
United States District Judge